# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | **WILLIAM T. HART** | SITTING JUDGE IF OTHER THAN ASSIGNED JUDGE | |
|---|---|---|---|
| **CASE NUMBER** | **01 CR 852 - 3** | **DATE** | **JULY 2, 2003** |
| **CASE TITLE** | **UNITED STATES OF AMERICA v. PETER A. LOUTOS** | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Defendant Peter Loutos's sentencing guideline range is 37 to 46 months.  Defendant Loutos will be sentenced on July 23, 2003 at 11:30 a.m.

(11) ■ [For further detail see attached Memorandum Opinion and Order.]

| | |
|---|---|
| No notices required, advised in open court. | |
| No notices required. | |
| Notices mailed by judge's staff. | |
| ✓ Notified counsel by telephone. | |
| Docketing to mail notices. | |
| Mail AO 450 form. | |
| Copy to judge/magistrate judge. | |

number of notices

JUL 03 2003
date docketed

docketing deputy initials

date mailed notice

cw — courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
03 JUL -2 PM 4:44

Date/time received in central Clerk's Office

mailing initials

Document Number

334

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. ) No. 01 CR 852-3
)
PETER A. LOUTOS, SR., )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

In 2001, an indictment was returned charging defendant
Peter Loutos and five codefendants with one count of a money
laundering conspiracy, eight substantive counts of wire fraud,[1]
and seven substantive counts of money laundering. Loutos was
named in all 16 counts. On October 30, 2002, however, Loutos
pleaded guilty to one count of a superseding indictment charging
him with making a false statement on an application for the
purpose of influencing a federally insured bank in violation of
18 U.S.C. §§ 1014 and 2.[2] The preliminary Sentencing Guideline
calculation contained in the Plea Agreement applied U.S.S.G.
§ 2F1.1[3] and determined a total offense level of four and a

---

[1]The wire fraud scheme will be referred to as "investment
fraud."

[2]This charge and conduct will be referred to as "bank
fraud."

[3]Guideline 2F1.1 is not contained in the 2001 or 2002
Guidelines Manual. The Plea Agreement does not specify which
year's Guidelines Manual was relied upon.

criminal history category of I for a sentencing range of zero to six months. At the time of the plea colloquy, the court accepted Loutos's plea of guilty, but deferred ruling on acceptance of the Plea Agreement until after consideration of the Presentence Report ("PSR"), which was also expected to be after the trial of the codefendants had been completed. See Fed. R. Crim. P. 11(e)(2) (2001); U.S.S.G. § 6B1.1(c); United States v. Loutos, 2003 WL 1845308 *3-6 (N.D. Ill. April 4, 2003) ("Loutos II").

The initial PSR that was submitted to the court by the probation officer also concluded that the applicable sentencing range was zero to six months. Unlike the calculations contained in the Plea Agreement, the probation officer applied § 2B1.1 of the 2002 Guidelines Manual. A minute order was thereafter issued directing that the parties address certain issues pertaining to sentencing. Thereafter, having heard the evidence that was presented at the trial of Loutos's codefendants and having considered the initial PSR, the parties' supplemental submissions, and possible Guidelines applications, on January 23, 2003, the court accepted Loutos's Plea Agreement. See United States v. Loutos, 2003 WL 168627 (N.D. Ill. Jan. 24, 2003) ("Loutos I"). See also Loutos II, 2003 WL 1845308 at *5-6 & n.9. The question of the appropriate sentencing range, however, was left open to be determined in further proceedings.

In Loutos I, the court made clear that it was not bound by the preliminary Guidelines calculations contained in the Plea Agreement nor the stipulations contained therein. Loutos I, 2003

WL 168627 at *4-5. It was also made clear that additional facts
would have to be considered before a determination was made as to
the appropriate sentencing range. See id. at *3-10. Most
importantly, it would be determined whether Loutos participated
in the investment fraud charged in the original indictment and,
if so, whether the investment fraud was relevant conduct or
should otherwise be considered in sentencing Loutos on the bank
fraud charge. It was recognized that Loutos was entitled to an
opportunity to be heard as to the additional facts and issues and
would be provided with such an opportunity. See id. at *2-3.
Additionally, Loutos I, submissions of the government and
probation officer, and statements in court have provided Loutos
with sufficient notice of the additional facts and issues that
were to be considered in determining an appropriate sentencing
range and sentence.

In accordance with Loutos I, the government provided a
supplemental version of the offense. Thereafter, the parties
each filed a sentencing memorandum addressing the issues raised
by Loutos I and the supplemental version of the offense. The
government took the position that evidence would prove that
Loutos participated in the investment fraud and money laundering,
but that it was not relevant conduct and therefore did not affect
his total offense level. Loutos contended the evidence would not
show he participated in the investment fraud. Alternatively, he
contended the investment fraud would not constitute relevant
conduct or otherwise affect his total offense level or sentencing

range. In the meantime, Loutos had moved to withdraw his plea of guilty, but that motion was denied. See Loutos II, supra. The probation officer thereafter issued a supplemental PSR. She again applied current Guideline 2B1.1 and found a sentencing range of zero to six months, though this time based on a total offense level of 6 instead of 4. The probation officer no longer recommended a two-level reduction for acceptance of responsibility based on Loutos asserting legal innocence as one ground for withdrawing his guilty plea.

The court then provided the parties with the opportunity to present whatever additional evidence that they desired to present for purposes of sentencing. The parties submitted a limited written stipulation. Loutos was provided the opportunity to call witnesses, but instead chose to submit certain depositions (of himself[4] and others) that were taken in related civil proceedings, transcripts of certain recorded telephone conversations, and some documentary evidence.[5] The government presented the testimony of its case agent, a United States Postal

---

[4]Two depositions of Loutos have been provided. One is a deposition of Loutos in a proceeding initiated by the SEC against Lennox, taken on May 24 and 25, 1999 (the "SEC Deposition"). The second is a February 21, 2001 deposition taken in a proceeding initiated by the SEC receiver (the "Quilling Deposition").

[5]Loutos represented at the June 11, 2003 hearing that he would provide a purported Defendant's Exhibit 8, his legal file relating to Joanne Fried. That exhibit was never found and defendant instead provided two documents from the file of the opposing counsel in that case.

Inspector, who testified as to investigatory interviews of two persons. The government also submitted documents.

As was previously held, "[f]indings for purposes of sentencing may be based on any reliable evidence, including hearsay or other evidence that would not ordinarily be admissible at trial." Loutos I, 2003 WL 168627 at *3. As the parties have been informed and are aware, this includes evidence that was before the court in the trial of the codefendants between November 4 and December 9, 2002. Id. Facts to be found for purposes of sentencing must be found by a preponderance of the evidence. Id.

The original indictment in this case alleged:

> defendants FRANK PEITZ, DANIEL BENSON, PETER LOUTOS, ROBERT PALADINO, RANDALL LAW, MONICA ILES and others, through FLP Capital, Active International[, Inc.] and Lennox [Investment Group, Ltd.], sought to and did obtain and retain funds from prospective investors and investors by offering and selling investments purportedly in the international trading of bank financial instruments. In offering and selling these investments, the defendants made and caused to be made material misrepresentations and omissions about, among other things: the risk involved in the investment; the expected return on the investment; the use of money raised from investors; and the previous investment experience and the criminal and regulatory background of those offering and selling the investment. As a part of the scheme, the defendants raised over $11,000,000 from at least 30 investors and then misappropriated almost all of the funds for their own benefit. In order to retain the use of investors' funds and obtain additional funds from new investors and to conceal various parts of the scheme from victim investors and others, defendants continued to lull investors through a series of misrepresentations and omissions about the nature and status of their investments as

> well as by repaying earlier, disgruntled
> investors with funds from new investors.

Indictment ¶ 3.

All six defendants were charged with eight substantive counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2. The alleged wire communications underlying these counts occurred from October 10, 1996 through May 22, 1997. Defendants Peitz, Benson, Loutos, and Paladino were also charged with a money laundering conspiracy in violation of 18 U.S.C. § 1956(h) under which they agreed to (1) conduct financial transactions involving the proceeds of the wire fraud scheme in order to promote the scheme in violation of 18 U.S.C. § 1956(a)(1)(A)(i); (2) engage in wire fraud violations that were designed to conceal the source and ownership of unlawful proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and (3) engage in monetary transactions in criminally derived property with a value greater than $10,000 in violation of 18 U.S.C. § 1957(a). The conspiracy allegedly began no later than October 1994 and continued until at least June 1998. The four alleged conspirators were also charged with five substantive counts of violating 18 U.S.C. §§ 1957 and 2 and two substantive counts of violating 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2.

In pleading guilty to the bank fraud charge, Loutos admitted that, in June 1996, he aided Benson in opening a bank account for Lennox Investment Group Ltd. (the "Lennox Account") at First of America Bank and making false representations as to

Benson's sole ownership of Lennox, a corporation, in order to influence the bank to open the account with Benson and Loutos as signatories on the account. Benson, however, was not ever an owner, or officer, of Lennox.

Because he did not plead guilty until just before the trial of the codefendants began, Loutos had access to all the pretrial discovery that was provided to the other defendants. He has also had the opportunity to read the transcript of the codefendants' trial. Following a jury trial, the codefendants were found guilty as to all counts except for one count (Count 13) of violating § 1957. In sentencing each of the codefendants, the loss amount under U.S.S.G. § 2F1.1(b)(1) (1997) and, for whom applicable, U.S.S.G. § 2S1.1(b)(2) (1997), was found to be over $10,000,000. See United States v. Peitz, 2003 WL 1964241 (N.D. Ill. April 25, 2003). The total offense levels and sentencing ranges for each codefendant were determined to be as follows: Peitz: 35/168-210 months; Benson: 34/151-188 months; Paladino: 27/70-87 months; Law: 27/78-97 months; and Iles: 27/78-97 months. Id. Each codefendant was sentenced to the following number of months of incarceration: Peitz: 188; Benson: 188; Paladino: 72; Law: 84; and Iles: 78. Each was also ordered to pay in excess of $11,000,000 in restitution.

Based on the evidence presented at the trial of the codefendants, it is found that the scheme to defraud charged in the indictment occurred and that it involved more than $11,000,000 of investor funds funneled through the Lennox

- 7 -

Account that is the subject of Loutos's bank fraud charge. Also, more than $1,000,000 in investor funds were transferred to the trust account of Loutos's law firm. Although in fact a demand checking account, the Lennox Account was titled as being an escrow account. Loutos was aware that an escrow title was placed on the account and was also aware no escrow agreement was set up nor were any other formalities of an escrow account ever established. Special deposit confirmation statements addressed to Randall Law, Peter Loutos, Loutos & Leventis, Ltd., at the address of the Loutos law firm and referring to an "escrow account," were requested by Benson and issued by the bank. The confirmations were sent to Loutos with a copy to Daniel Benson. Copies of the deposit confirmations were made and sent to the investors whose monies were wired and deposited in the account. The confirmation statements were intended to give investors the false impression that their money was protected in an escrow account and an attorney exercised some control over the account. Use of this account was a significant aspect of the investment fraud scheme. Having funds pass through the law firm trust account also gave some of the transactions an additional appearance of legitimacy.

Loutos does not dispute the facts set forth in the preceding paragraph. He contends, however, that his participation was completely innocent and that he was totally unaware of the investment fraud in which the others participated. Throughout his deposition testimony that has been provided,

Loutos repeatedly denies any significant knowledge of the
practices and business dealings in which his client, Benson, was
engaged.  He also denies knowledge as to the practices and
business dealings of Peitz, whom Loutos sometimes characterized
as being his client for a period of time.  Loutos contends he was
unaware that any of the deposits in the Lennox Account were from
investors.  He contends he was unaware of who actually owned
Lennox and in what type of business it was engaged.  Loutos
testified that he did not inquire about the conduct or dealings
of Benson and Peitz.  He even testified that, when negotiating
settlements of judgments taken against Benson and Peitz for money
taken as advance fees in failed funding projects, he never
learned of the disputes that were being settled.  Based on the
evidence before the court as herein related, Loutos's testimony
professing virtual ignorance of Benson's and Peitz's business
conduct, transactions, and fraud is not credible.  Even if
Loutos's protestations of lack of knowledge were to be accepted,
at best, they would show that he intentionally tried to remain
ignorant of the crimes he was aiding, which would not relieve him
of criminal liability.  See United States v. Wallace, 212 F.3d
1000, 1004-05 (7th Cir. 2000).

Loutos has been a practicing attorney since 1964.  His
practice has been exclusively civil and he is an experienced
attorney.  He has generally been a partner in a small law firm or
a sole practitioner.  Financial information included in the PSR

indicates he lives comfortably, but not that he is particularly wealthy. There is no evidence that Loutos participated directly in receiving a share of the unlawful proceeds, although over $1,000,000 of investor money passed through his attorney trust account. There is also evidence that Benson provided, from investor money, a $150,000 loan for Loutos's nephew that was repaid. Loutos personally borrowed $35,000 from Benson which came from investor money and which Loutos then lent to his son. The $35,000 loan was repaid to the receiver only after the SEC initiated an investigation.

The parties have stipulated that Loutos received $200,000 for legal work he did for Benson and Peitz over a period of two years or less. That would represent a substantial portion of Loutos's income during that time period. At $150 per hour, that represents 1,333 hours of work. Even if some of the charges were for expenses so that the actual hours were less, it represents a substantial portion of Loutos's work during that time period.

Loutos testified that he was aware that, prior to June 1996, Benson had no car or place to live and was getting by on money borrowed from Paladino. SEC Dep. at 274-83. During the preceding 18 months, none of the deals in which Loutos had represented Benson actually closed and Loutos was aware of no other source of income for Benson. Loutos was also aware that, shortly after they first met, Benson had set up another account at the same bank on which Loutos had also had signatory power and

Loutos was aware that account was still open in June 1996. Nevertheless, Loutos contends he did not question assisting Benson in opening the Lennox Account under false pretenses and that he made no inquiries when millions of dollars began being deposited into the account. Loutos's position is that he remained totally ignorant of the sources and uses of the funds.

As initially established and for a few months thereafter, Loutos had signatory powers for the Lennox Account. Even after he was removed as a signatory for the account, the confirmation statements continued to be sent to Loutos's law office. The fact that Benson and Peitz were willing to give Loutos control over and access to the Lennox Account through which $11,000,000 in unlawful proceeds was passed is evidence from which it can be inferred that Loutos was not an ignorant participant.

On July 2, 1996, the bank forwarded to Loutos the July 2, 1996 letter of Harold Miller, an attorney for Lennox investors, in which Miller stated that $600,000 being wire deposited in the Lennox Account was to be held in escrow. Even if he did not know already of an investor program, that letter would have given Loutos notice that funds being deposited into the Lennox Account were not limited to earnings or commissions of Benson. Gov. Exh. 68 is a one page letter and attachment from a Lennox investment agreement stating that investment funds would be held in the "escrow account." The exhibit shows that both pages were "faxed" to Loutos on July 2. The exhibit clearly discloses the existence

of investors and investor money even though Miller was induced by Iles to withdraw his July 2 letter by virtue of another provision in the investor agreements prohibiting investors from contacting the bank for any reason under pain of penalty. The fact that Miller withdrew the letter does not eliminate the fact that Loutos had to know no later than July 2, 1996 that investor money was coming into the Lennox account.

In late July 1996, Pietz directed Loutos to withdraw $250,000 from the Lennox account and wire it to C. Hoare & Co., which he did. That money was part of the investor funds obtained by the investor fraud and laundered by transfers. It is not reasonable to assume that Loutos would transfer such a sum out of a Lennox Account controlled by Benson at the direction of Pietz without knowing that Benson and Pietz were both obtaining and distributing investor money.

On August 2, 1996, Loutos wrote a letter to Randall W. Law, President, CitiCapital Corporation on Loutos's letterhead which states:

> This letter is to confirm that my client, Mr. Frank L. Peitz of Active International, Inc., has the ability to provide a Safe-Keeping Receipt on a One-year Bank Guarantee Instrument (text attached) with a face value of One Hundred and Eight Percent (108%) of your company's investment amount, provided the investment amount is for a minimum sum of Ten Million United States Dollars ($10,000,000.00 US).

Loutos concedes that he had no basis for the representations contained in the letter. To the contrary, up to that point in

- 12 -

time, Peitz had shown a total inability to complete any of the
funding projects on which he had worked with Benson. Loutos was
aware that Pietz had taken money from Jery Sedy, Suresh Thadhani,
Richard Marcus, and defendant Paladino's father without ever
obtaining project funding and that he had failed to fund the
Westmar University project. Loutos provided false
representations in aid of the scheme to defraud. Loutos's
contention that it was simply an error of judgment or a stupid
act to provide the letter as drafted and requested by Peitz is
inconsistent with Loutos being an experienced attorney and is not
persuasive in light of his other acts in aid of the investment
fraud scheme.

Early in August 1996, Loutos learned that the FBI and SEC
were investigating transactions in which Benson and Peitz were
involved. Loutos telephoned Joanne Fried in New York and told
her not to speak to the FBI and told the FBI he was representing
her. Fried testified that Loutos was not her attorney. Any
legal work he had previously done for Fried regarded terminating
a lease for an unrelated business and apparently was done at the
request of Peitz without Fried's knowledge that Loutos was
representing her. Contacting Fried and talking to the FBI was
not conduct of a person unaware that any wrongdoing may have been
occurring.

After learning of the investigations, Loutos sent Peitz
an August 8 letter stating that he would no longer be

- 13 -

representing Peitz or his corporation. Loutos, however,
continued to represent Benson.

In April 1997, the bank having the Lennox Account froze
that account and Benson's FLP account to which Lennox investor
funds had been transferred and initiated an interpleader action.
An investor group was seeking access to funds that had been
deposited in the Lennox Account. Loutos represented Benson and
one of Benson's companies in this action. There was an express
allegation in the interpleader action that funds from investors
were deposited. Also, Loutos's participation in the lawsuit
provided him with additional information about sources of funds.
Loutos further aided the investment fraud scheme by making false
representations in order to induce the complaining investors to
settle for substantially less than their investment. Loutos told
Harold Miller, the attorney representing investors of $600,000,
that money in the FLP account belonged to Benson and that Randall
Law stole the money that had been in the Lennox Account. Miller
settled for $100,000. Loutos assisted Benson in obtaining
$300,000 of investor funds that were in the FLP account at the
time.

The evidence shows that all of the investor funds in the
Lennox Account were taken by Benson, Peitz, and Paladino. Some
of it was put in the FLP account. None of that money belonged to
Benson.

Questions as to Loutos's credibility are also raised by discrepancies between his SEC Deposition testimony and his Quilling Deposition testimony, as well as a statement to the postal inspector. In an August 16, 2001 interview, Loutos attempted to portray his innocent involvement by stating that he was unaware there were investor funds in the Lennox Account until the SEC filed suit in 1998. However, this is clearly contradicted by the fact that the interpleader complaint had contrary allegations in 1997 and the knowledge Loutos otherwise learned during the pendency of that action. Additionally, Miller's July 1996 letter would have put Loutos on notice as well. In May 1999, Loutos testified Benson said nothing about the sources of the monies to be deposited into the Lennox Account. SEC Dep. at 72-73. In February 2001, he testified that Benson told him the funds were earnings and commissions he had earned or funds provided to him by Peitz. Quilling Dep. at 26-31. In 1999, Loutos testified as to ignorance of the Lennox Account being set up and titled as an escrow account, SEC Dep. at 81-82, but in 2001 he recalled Benson requesting it be called an escrow so he could use it for mortgages, Quilling Dep. at 104-05. Loutos did not remain consistent when proclaiming ignorance.

On the evidence before the court, it is found by a preponderance of the evidence that Loutos was aware that investor funds were deposited into the Lennox Account, that they were obtained based on false representations, and that they were being

diverted to his codefendants' personal use. It is found that Loutos aided and abetted the investment fraud and that he was a knowing participant. For the reasons stated below, it is held that the investment fraud is relevant conduct for the bank fraud to which defendant pleaded guilty.

Although Benson was not an owner of Lennox, Loutos committed the bank fraud by aiding and abetting false statements to that effect so that Benson could open an "escrow" account in Lennox's name. That account was then used to funnel more than $11,000,000 in unlawful proceeds from the investment fraud and also aided that fraud by providing an appearance that the money was safe because in an escrow account over which an attorney had some control. It is contended that the investment fraud is not relevant conduct for the bank fraud. Since the bank fraud was completed in June 1996, the 1995 Guidelines Manual will be used. See Loutos I, 2003 WL 168627 at *8. Unless indicated otherwise, that is the version of the Guidelines Manual that is cited below.

The relevant conduct guideline provides in part:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)   solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

U.S.S.G. § 1B1.3(a)(1)-(2).

There is no dispute that the bank fraud and investment fraud would be grouped together under § 3D1.2(d). It is also clear that the bank fraud was part of the same common scheme as the investment fraud. There was one common scheme to defraud investors. Both the false statements in opening the Lennox account and the acts of wire fraud were part of that common scheme. In order for both to be part of a common scheme, they must be substantially connected by at least one common factor. U.S.S.G. § 1B1.3, comment. (n.9(A)). Here, there are common accomplices and, with the bank account viewed as part of the acts needed to deceive the investors and obtain funds, common victims and a common purpose. The bank fraud and investment fraud are part of a common scheme. Therefore, under § 1B1.3(a)(2), the investment fraud constitutes relevant conduct.

It is argued that the "during the commission of the offense" limitation of § 1B1.3(a)(1) also limits § 1B1.3(a)(2) and therefore the investment fraud cannot be relevant conduct

because it did not occur as part of or during the bank fraud. However, the case law is to the contrary. Relevant conduct can occur "before, during and after the offense" of conviction. United States v. Matthews, 116 F.3d 305, 307-08 (7th Cir. 1997). See also United States v. Bjorkman, 270 F.3d 482, 496-97 (7th Cir. 2001), cert. denied, 535 U.S. 1095 (2002) (favorably citing cases that base relevant conduct on offenses that occurred after the offense of conviction). The relevant conduct may be part of the same course of conduct by being part of an "ongoing series of offenses." U.S.S.G. § 1B1.3 comment. (n.9(B)); Matthews, 116 F.3d at 307. The Seventh Circuit has expressly held that § 1B1.3(a)(1) does not limit § 1B1.3(a)(2) in the manner suggested by the government.

> Under the provisions that relate to money
> laundering, relevant conduct includes all acts or
> omissions, including jointly undertaken criminal
> endeavors, "that were part of the same course of
> conduct or common scheme or plan as the offense
> of conviction." U.S.S.G. § 1B1.3(a)(2). . . .
> (Olson is incorrect when he asserts that
> § 1B1.3(a)(1)(B) governs here, under which we
> would restrict our consideration to activities
> that occurred "during the commission of the
> offense of conviction," or in preparation for
> that offense or to avoid detection or
> responsibility for that offense.)

United States v. Polichemi, 219 F.3d 698, 713 (7th Cir. 2000), cert. denied, 531 U.S. 993, 1168 (2000, 2001). See also United States v. Schaefer, 291 F.3d 932, 939 n.5 (7th Cir. 2002); United States v. Brierton, 165 F.3d 1133, 1137 (7th Cir. 1999); United States v. Boone, 279 F.3d 163, 178 (3d Cir.), cert. denied, 535

U.S. 1089 (2002); United States v. Fitzgerald, 232 F.3d 315, 319 (2d Cir. 2000).

The investment fraud that Loutos participated in is relevant conduct for the bank fraud. Cf. Brierton, 165 F.3d at 1137; United States v. Polichemi, 201 F.3d 858, 866 (7th Cir. 2000), cert. denied, 531 U.S. 993, 1168 (2000, 2001). Therefore the losses related to the investment fraud are considered in determining the loss amount for Loutos's offense level. Loutos is responsible for more than $10,000,000 in losses to investors.

Alternatively, even if the investment fraud did not constitute relevant conduct, it would be found that the bank fraud was a cause of the loss to investors. Guideline 2F1.1 did not contain a definition of causation. The Guideline that would currently be applicable to bank fraud defines loss as follows:

> (i) Actual Loss.--"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
> * * *
> (iv) Reasonably Foreseeable Pecuniary Harm.--For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

U.S.S.G. § 2B1.1 comment. (n.2(A)(i), (iv)) (2002).

Although this language was not in § 2F1.1 during the relevant time, § 2F1.1 contained other references to a reasonable foreseeability standard. See U.S.S.G. § 2F1.1 comment., (nn.7(c), 10(a), 10(c)). See also id. § 1B1.3(a)(1)(B). Case

- 19 -

law has applied such a standard.  See, e.g., United States v.
Sarno, 73 F.3d 1470, 1501 (9th Cir. 1995), cert. denied, 518 U.S.
1020, 519 U.S. 859 (1996).  Also, it is not necessary that a
defendant be a direct or even proximate cause of the loss; it is
sufficient that the defendant's conduct was a factual
prerequisite for the loss.  United States v. Morris, 80 F.3d
1151, 1171-74 (7th Cir.), cert. denied, 519 U.S. 868 (1996);
United States v. Ware, 282 F.3d 902, 907 (6th Cir. 2002).
Opening the Lennox Account was a prerequisite to completing the
Lennox portion of the investment fraud and the losses that
thereafter occurred were reasonably foreseeable.  If the
investment fraud did not constitute relevant conduct, the
$11,000,000 in investor losses would still be found to have been
caused by Loutos's bank fraud.

Because the investor fraud losses are being taken into
consideration in determining defendant's sentencing range, it is
unnecessary to consider an upward departure which would otherwise
be appropriate because the false statements made for purposes of
opening the bank account in violation of § 1014 were also made to
facilitate the investment fraud that violated the wire fraud
statute.  See U.S.S.G. § 2F1.1 comment. (n.10(b)).  See also
U.S.S.G. §§ 5K2.9; 2B1.1 comment. (n.15(A)(iv)) (2002).

An issue exists as to whether or not Loutos should be
entitled to any reduction for acceptance of responsibility.  See

U.S.S.G. § 3E1.1. As to the two-level reduction under

§ 3E1.1(a), the Commentary provides:

> 1. In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
> (a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility;
> . . . .

U.S.S.G. § 3E1.1 comment. (n.1(a)).

Here, Loutos has argued that he did not commit the investment fraud that has been found to be relevant conduct. However, the present case involves an unusual circumstance. Loutos entered into a Plea Agreement which contained a preliminary Guideline calculation which assumed that the investment fraud did not constitute relevant conduct. Loutos continues to contend that the investment fraud does not constitute relevant conduct. Under this view, the investment fraud would not be considered. Moreover, Loutos was expecting a sentencing range of zero to six months. Instead, the range can

go no lower than 33 months with a three-level reduction for acceptance of responsibility (20 total offense level) and as high as 57 months with no acceptance of responsibility (23 total offense level). Given the circumstances of this case, it is understandable that Loutos would argue that the investment fraud should not be considered and that he did not engage in such conduct. However, he has not provided current testimony in which he denies such involvement. It is also understandable that Loutos would attempt to withdraw his plea upon recognizing that the court may have a different view of the appropriate sentencing range than the preliminary calculation contained in the Plea Agreement. While the issue is close, the court finds that, under the special circumstance of defendant's plea resulting in a substantially greater sentencing range than originally anticipated by the parties, Loutos has made a sufficient showing of acceptance of responsibility and it is appropriate to apply a two-level reduction under § 3E1.1(a). The additional one-level reduction under § 3E1.1(b) is inapplicable because Loutos did not provide complete information that assisted the government in its investigation and he did not plead guilty sufficiently in advance of the trial date to avoid preparation for trial.

Since the one-additional one-level reduction is otherwise found to be inapplicable, it is unnecessary to determine whether a recent procedural amendment to § 3E1.1(b) requiring a motion by the government would be applicable to this case which is

otherwise applying the 1995 Guidelines Manual.  See U.S.S.G.
§ 3E1.1(b) (April 30, 2003); Prosecutorial Remedies and Tools
Against the Exploitation of Children Today Act of 2003 (PROTECT
Act), Pub. L. No. 108-21 § 401(g)(2), 117 Stat. 650, 671-72.

The investment fraud has been found to be relevant
conduct.  Therefore, applying U.S.S.G. § 2F1.1 (1995), Loutos's
Total Offense Level is calculated as follows:

| | | |
|---|---|---|
| 2F1.1(a) | Base offense level | 6 |
| 2F1.1(b)(1)(P) | over $10,000,000 | 15 |
| 2F1.1(b)(2) | more than minimal planning/one victim | 2 |
| 2F1.1(b)(5) | use of foreign accounts[6] | 0 |
| 2F1.1(b)(6)(B) | more than $1,000,000 in personal receipts affecting financial institution[7] | 0 |
| 3B1.1 | aggravating role (leader/supervisor) | 0 |
| 3B1.2(b) | mitigating role (minor participant)[8] | -2 |
| 3B1.3 | abusing position of private trust (lawyer)[9] | 2 |
| 3C1.1 | obstruction of justice | 0 |
| 3E1.1 | acceptance of responsibility | -2 |
| | **Total Offense Level** | 21 |

A Total Offense Level of 21 and a Criminal History
Category of I provides for a sentencing range of 37 to 46
months.  The fine range if $7,500 to $1,000,000.  See U.S.S.G.
§§ 5E1.2(C)(2)-(4); 18 U.S.C. § 1014.  These guideline ranges

---

[6]This adjustment is inapplicable when the offense level
is otherwise 12 or above.

[7]Loutos personally received less than $1,000,000.

[8]See Loutos I, 2003 WL 168627 at *9.

[9]See id.

will be employed when Loutos is sentenced on July 23, 2003 at 11:30 a.m.

For purposes of restitution, any loss must be caused directly by the bank fraud to which Loutos pleaded guilty. <u>See</u> <u>United States v. Behrman</u>, 235 F.3d 1049, 1052-53 (7th Cir. 2000). In accordance with ¶ 17 of the Plea Agreement, it is found that Loutos is not responsible for any restitution.

IT IS THEREFORE ORDERED that it is found that defendant Peter Loutos's sentencing guideline range is 37 to 46 months. Defendant Loutos will be sentenced on July 23, 2003 at 11:30 a.m.

ENTER:

_William T. Hart_
UNITED STATES DISTRICT JUDGE

DATED: JULY 7 , 2003